# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

KEVIN CHESTNUT,          )
          )
      Plaintiff,       )
          )
    v.            )     **Case No.  4:16-cv-1721 PLC**
          )
OFFICER DAWAIN WALLACE, et al.,   )
          )
      Defendants.     )

## MEMORANDUM AND ORDER

This matter is before the Court[1] on: (1) Plaintiff Kevin Chestnut's motion for partial summary judgment as to Count I against Officer Dawain Wallace [ECF No. 67]; and (2) Defendants' motion for summary judgment as to both Counts [ECF No. 70].  For the following reasons, the Court: (1) denies Plaintiff's motion for partial summary judgment; (2) grants Defendants' motion in favor of Defendants Officer Tiffany Burns (now referred to as Tiffany Porter) and Officer Justin Ludwig with respect to Count I and Defendant City of St. Louis ("the City") with respect to Count II; and (3) denies Defendants' motion with respect to the claims against Officer Wallace in Count I.  After this ruling, the only claim remaining for trial is Plaintiff's claim in Count I against Defendant Officer Wallace, which the Court schedules for trial.

In January 2017, Plaintiff filed an Amended Complaint[2] seeking monetary relief pursuant to 42 U.S.C. § 1983 from Officers Wallace, Ludwig, and Porter for their detention, search, and arrest of Plaintiff in February 2015, and from the City based on its municipal liability for that

---

[1]  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c) [ECF No. 37].

[2]  Plaintiff amended his original complaint on January 20, 2017 to substitute Defendant Officer Justin Ludwig for the John Doe defendant named in the original complaint [ECF No. 14].

incident [ECF No. 14].  In Count I, Plaintiff alleges he was watching a traffic officer conduct several traffic stops when Officer Wallace approached him and accused him of acting suspiciously.  Plaintiff further claims that Officer Wallace detained, handcuffed, and frisked him without a reasonable suspicion that he was engaging in criminal activity.  In Count II, Plaintiff alleges the City has an unconstitutional policy, custom, or practice authorizing the City's police officers to detain people who observe the police in the course of performing their duties.

Plaintiff moves for partial summary judgment against Officer Wallace on the grounds that he detained Plaintiff without reasonable suspicion and in violation of Plaintiff's clearly-established rights.  Officers Wallace, Ludwig and Porter seek summary judgment on the basis that Officer Wallace had reasonable suspicion to detain Plaintiff, and therefore the three officers are entitled to qualified immunity.  The City moves for summary judgment on the grounds that it does not have a policy, custom or practice authorizing unconstitutional detentions.

## I.     *Legal Standard*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013).  The movant "bears the initial responsibility of informing the district court of the basis for its motion and must identify those portions of [the record]…which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The non-movant must then respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial."  Id. at 324 (marks omitted).

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts."  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)) (marks omitted). A

court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)) (marks omitted).

Where parties file cross-motions for summary judgment, each motion should be reviewed separately, with each non-moving party "entitled to the benefit of all inferences favorable to them which might be reasonably drawn from the record[.]" Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983); see also Canada v. Union Elec. Co., 135 F.3d 1211, 1212-13 (8th Cir. 1998). "[T]he filing of cross motions for summary judgment does not necessarily indicate there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." Wermager, 716 F.2d at 1214 (citing 10 Wright, Miller & Kane, FED. PRAC. & PROC. § 2720 (2d. ed. 1983)). The Court examines the parties' evidence of undisputed facts to determine whether either party is entitled to judgment as a matter of law. See Wermager, 716 F.2d at 1214.

## II.    Background

On February 6, 2015, Plaintiff was a resident of the City, living in the Shaw neighborhood north of Tower Grove Park. Officers Dawain Wallace, Tiffany Porter, and Justin Ludwig were patrol officers employed by the St. Louis Metropolitan Police Department ("SLMPD"). Officer Leviya Graham was a traffic enforcement officer employed by SLMPD and working on that date to enforce traffic ordinances near Tower Grove Park. [ECF No. 71-3.]

At approximately 5:40 p.m., Plaintiff was jogging in Tower Grove Park. [ECF No. 71-5.] While on the Tower Grove Park jogging path, Plaintiff observed Officer Graham stop a car [Id.]. Plaintiff watched the stop for approximately 5-10 minutes. [Id.] After observing the stop, Plaintiff resumed his jog. [Id.] Shortly thereafter, Plaintiff watched Officer Graham conduct another stop. [Id.] While watching the second stop, Plaintiff stood in a grassy area and leaned against a tree, between the jogging trail and the sidewalk. [Id.]

Plaintiff explained that he watched Officer Graham because "there's been a lot of difficulty in citizen/police interaction nationally. People have been losing their lives in those interactions, so I was just being alert in my neighborhood with that interaction [about] what was going on." [Id.] Plaintiff further stated, "There seemed like an unusual frequency of traffic stops, so I was curious, interested [in] what's going on in addition to the concern about the safety of all in the interaction." [Id.] While watching the second stop, Plaintiff moved to the grass between the jogging path and the sidewalk for a clear view. [Id.] Plaintiff was far enough away from Officer Graham that he could not see either the driver or Officer Graham well enough to describe them. [Id.] Plaintiff believed he was visible to Officer Graham, stating:

> [i]n moving that close to an interaction with police, I realize[d] it was important to be plainly visible, so I felt comfortable being at th[e] spot where I was forward of the police lights that I would be plainly visible with my yellow top, yellow shirt that I was standing there completely still, completely not interfering, and should be of no concern at all.

[Id.]

Officer Graham observed "an older guy in his 50s," watching her at several traffic stops. [ECF No. 71-3]. The man stood in the park on the north side of Arsenal Street while Officer Graham conducted a traffic stop on the south side of Arsenal. [ECF No. 71-3.] Officer Graham testified that the second time she noticed the man watching her, she concluded he was following

4

her. [Id.] Officer Graham stated that it was getting dark and the man was watching her from the shadows of the trees. [Id.] Officer Graham determined Plaintiff's behavior was suspicious: "I'm like, okay, and me being a female, that's not even just me being a cop, but a female, that's just suspicious behavior to me." [ECF No. 71-3.] Officer Graham called the SLMPD dispatcher and requested an assist car to investigate. [Id.] Officer Graham reported to dispatch that:

> she was conducting another car stop and there was an individual who appeared to be following her who was hiding in the treeline, but she could see him kind of like peeking around behind a tree. I guess, and she was worried about her safety since this was either the second or third car stop that this had occurred on.

[ECF No. 71-5].

Officer Wallace was the first officer to respond to Officer Graham's "suspicious person type call" person. [ECF No. 71-5, 81-3.] When he arrived at the scene, Officer Wallace observed a person standing by a tree who matched the dispatcher's description. [ECF No. 69-2.] He aimed his spotlight at the man to see him better. [Id.] Officer Wallace approached the man and asked for his identification. [Id.] When he discovered that the man did not have an ID with him, he asked for a name, birthday, and Social Security number. [Id.] Plaintiff provided his name, but stated he felt uncomfortable giving his full Social Security number. [Id.] After Plaintiff refused to provide his Social Security number, Officer Wallace conducted a pat-down search. [Id.] Officer Wallace then handcuffed Plaintiff. [Id.] Thereafter, Plaintiff requested to speak to a supervisor and also provided his Social Security number to Officer Wallace. [Id.]

Officer Wallace returned to his patrol car to determine whether Plaintiff had any outstanding warrants. [Id.] Officer Wallace did not find any outstanding warrants. [Id.] Officer Wallace did not believe Plaintiff had committed a crime. [Id.] Nor did Officer Wallace feel that Plaintiff threatened him. [Id.] After Officer Wallace's supervisor, Sergeant Frederick Lathan,

arrived and spoke with Plaintiff, he directed Officer Wallace to remove Plaintiff's handcuffs.

[Id.]  Sergeant Lathan then permitted Plaintiff to leave.  [Id.]

In June 2009, the SLMPD, through the Chief of Police, issued a number of "special orders" relating to police officer conduct.[3]  Chief of Police Special Order 1-06 addressed citizens' right to observe police activity, stating:

> Members of the public, including media representatives, have an unambiguous First Amendment right to record officers in public places, as long as their actions do not interfere with the officer's duties or the safety of officers or others. SLMPD employees will not prevent or prohibit any person's ability to observe, photograph, and/or make a video recording (with or without simultaneous audio recording) of police activity that occurs in the public domain so long as the person's location, actions and/or behavior do not create a legitimate, articulable threat to Officer safety, or an unlawful hindrance to successful resolution of the police activity.

[ECF No. 74 at 22].  Chief of Police Special Order 8-02 states:

> A person may be stopped on an officer's <u>REASONABLE SUSPICION</u> that he is committing, or is about to commit a crime, and may be asked his name, address, and even an explanation of his actions.  <u>NO RIGHT TO FRISK EXISTS UNLESS THERE IS FIRST A RIGHT TO STOP.</u>  Even then, a frisk is not lawful in every case where the right to stop exists.  A frisk is justified only when the officer reasonably suspects that the person lawfully stopped is armed and a present danger to the officer or another person.
>
> . . .
>
> "Officer safety," while a legitimate concerns, without any specific factual basis pointing to a reasonable suspicion that the subject is armed, is not sufficient to justify a pat-down or frisk of the person's outer clothing for weapons.

[ECF No. 81 at 5] (emphasis in the original).

---

[3] The parties agree that the Chief of Police Special Orders are official policies of the SLMPD and that Chief Samuel Dotson, the Chief of Police in 2015, was the "official . . . responsible for establishing policy from February 6, 2015 to March 19, 2015 with respect to investigative stops, detentions, and pat downs under circumstances consistent with Plaintiff's allegations in this matter."  [ECF Nos. 94, 94-1.]

Lieutenant Lauer,[4] the Commander of the Traffic Safety Division, and a witness designated by the City to testify on its behalf in a Rule 30(b)(6) deposition,[5] testified about practices that are not special orders:

> Q.     Is it a policy of the City of St. Louis Police Department that you can be – that a citizen in a public place can be detained without believing that that citizen was engaged in any crime?
>
>                 . . . .
>
> A.  I don't know that this occurred in this case, but yes, they – I mean, they – they can be detained for an investigation.
>
> Q.     So –
>
> A.     The officer followed his training.
>
> Q.     And – All right, so, let's talk about it's the training of the police officers of the City of St. Louis or training that you expect them to have that if they encounter a citizen in public, they can detain them without consent, right, they can detain them without having prior reason to believe that that citizen is engaged in any criminal activity.
>
>                 . . . .
>
> A.     They had information that he may have been a suspicious person, they d[id]n't know exactly what he did yet; that's what they're investigating.
>
>                 . . . .

---

[4] The City designated Lieutenant Lauer to testify about certain topics at the City's Rule 30(b)(6) deposition.  The City did not designate Lieutenant Lauer to discuss SLMPD policies.

[5] Rule 30(b)(6) states:

In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization.

The "general purpose of a Rule 30(b)(6) deposition is to permit the examining party to discover the corporation's position via a witness designated by the corporation to testify on its behalf." Rosenruist-Gestao E Servicos LDA v. Virgin Enters., Ltd., 511 F.3d 437, 440 n.2 (4th Cir. 2007) quoted in Estate of Thompson v. Kawasaki Heavy Indus., 291 F.R.D. 297, 303 (N.D. Iowa 2013) (marks omitted).

A.      In this – I mean, yes, in some cases.

Q.      In some cases, including this one?

A.      Yes.

Q.      And this one with Mr. Chestnut?

A.      Yes.

[ECF No. 81-4 at 67-69.]

### III.    *Discussion*

Plaintiff alleges in Count I that Officer Wallace unlawfully detained and searched him in violation of the Fourth Amendment.[6]  Plaintiff asserts he is entitled to judgment as a matter of law because no genuine issues of material fact exist regarding whether Officer Wallace violated his constitutional rights.  Officer Wallace responds that Plaintiff's motion fails because he had a reasonable basis to detain, handcuff, and frisk Plaintiff during a brief investigatory stop.  Officer Wallace, Officer Ludwig, and Officer Porter also move this Court for summary judgment based on qualified immunity, because Plaintiff failed to show a genuine issue of material fact that:  (1) Officer Wallace violated Plaintiff's rights; and (2) Plaintiff had a clearly established constitutional right to be free from a detention under the circumstances here.

Plaintiff alleges in Count II that the City's policies authorizing investigatory stops without reasonable suspicion that crime is afoot violated his Fourth Amendment rights.  The City asserts it is entitled to summary judgment because Plaintiff has failed to identify an unconstitutional policy, practice, or custom.  Plaintiff responds that genuine issues of material fact exist regarding whether the City has an unwritten policy that allows "police officers to seize

---

[6]  Plaintiff does not move for summary judgment against Officers Ludwig and Porter.

and search a person in a public place without reason to believe that the person is engaging in criminal activity or that the person is armed and dangerous." [ECF No. 80 at 13.]

## A. Fourth Amendment Violation

Plaintiff asserts a right to summary judgment because Officer Wallace violated his Fourth Amendment rights and is not entitled to qualified immunity. More specifically, Plaintiff contends that Officer Wallace lacked reasonable suspicion to detain him. Officer Wallace responds that he had "a particularized and objective basis" for detaining Plaintiff.

To support a claim under Section 1983, a plaintiff must allege (1) that the defendant acted under color of state law; and (2) that the defendant's alleged conduct deprived the plaintiff of a constitutionally, protected federal right. See Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009). Here there is no dispute that any of the individual police officers acted under color of state law. Rather, the parties dispute whether any Defendant violated Plaintiff's constitutional rights under the Fourth Amendment.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002), quoted in Wilson v. Lamp, 901 F.3d 981, 986 (8th Cir. 2018). In Terry v. Ohio, the Supreme Court stated, "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime – 'arrests' in traditional terminology." 392 U.S. 1, 16 (1968). Moreover, the Terry Court reasoned:

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is

whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or hunch, but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

392 U.S. at 27 (citations and marks omitted). Finally, the <u>Terry</u> Court held:

Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

<u>Id</u>. at 30.

To determine whether an investigatory stop and search are reasonable, a court examines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." <u>Wilson</u>, 901 F.3d at 986 (quoting <u>Terry</u>, 392 U.S. at 19-20). As the Eighth Circuit recently held:

The search must be strictly tied to and justified by the circumstances which rendered its initiation permissible. The officer must have a reasonable suspicion supported by articulable facts that criminal activity may be afoot. Reasonable suspicion requires some minimal level of objective justification. A stop made on a hunch is insufficient. [A] court looks at the totality of the circumstances in analyzing whether an objective justification existed. The limitations which the Fourth Amendment places upon a protective seizure and search for weapons will have to be developed in the concrete factual circumstances of individual cases. Reasonable suspicion is not a finely-tuned or bright-line standard; each case involving a determination of reasonable suspicion must be decided on its own facts.

Id. (citations and marks omitted). "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." Florida v. J.L., 529 U.S. 266, 271 (2000).

Plaintiff argues that Officer Wallace detained, frisked, and handcuffed him without a reasonable suspicion that Plaintiff was either armed and dangerous or committing a crime. Plaintiff states that Officer Wallace's only source of information came from Officer Graham's dispatch call asking for an assist vehicle and his own conclusions viewing Plaintiff. Plaintiff further asserts that Officer Wallace admits that, at the time of the detention, he did not believe that Plaintiff: (1) had committed or was about to commit a crime; (2) was armed; (3) or was dangerous. Indeed, Officer Wallace concedes that he did not ask Plaintiff any "investigatory" questions, including a request to explain the reason Plaintiff was watching Officer Graham.

Officer Wallace responds that he had "a particularized and objective basis" for stopping Plaintiff. More specifically, Officer Wallace argues that, based on his years of experience, Plaintiff's behavior was unusual. [ECF No. 71-9.] He further contends that given the time of day, Plaintiff's conduct was "suspicious" because Plaintiff was watching Officer Graham conduct a "run-of-the-mill traffic stop" while concealing himself in the shadows of the trees of Tower Grove Park. [Id.] Officer Wallace contends that he did not know Plaintiff's mindset, based on Plaintiff's behavior and location. [ECF No. 71-9.] Officer Wallace further asserts that he was not aware of whether Plaintiff was capable of a violent act. [Id.]

Reasonable suspicion requires an officer to have "articulable facts that criminal activity may be afoot" and "some minimal level of objective justification." Wilson, 901 F.3d at 986. However, a determination of what Officer Wallace perceived and considered, as well as

discounted and failed to notice, requires a credibility determination that cannot be made at the summary judgment stage. See Anderson, 477 U.S. at 255.

Neither Plaintiff nor Officer Wallace identify objective undisputed facts establishing whether Officer Wallace had a reasonable suspicion to detain Plaintiff. Accordingly, whether Officer Wallace had a reasonable suspicion that Plaintiff was committing or preparing to commit a crime is a question of fact for the jury to decide. The Court denies Plaintiff's motion for partial summary judgment.

### B. Qualified Immunity

#### 1. Officer Wallace

Officer Wallace asserts that he is entitled to summary judgment on the basis of qualified immunity. More specifically, Officer Wallace contends that Plaintiff failed to prove that Officer Wallace had notice of Plaintiff's clearly-established rights under the facts of this case. Plaintiff counters that the law governing investigative stops has been established since Terry, 392 U.S. at 19-20. Plaintiff also asserts that Eighth Circuit case law applicable at the time of Plaintiff's detention placed a reasonable officer on notice that police officers must have "specific, articulable facts" to detain, handcuff, and frisk a citizen.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231–32 (2009).

As the Eighth Circuit held, "Qualified immunity is designed to shield officers from liability when they engage in conduct that is not clearly outside the realm of what the Constitution permits." Ross v. City of Jackson, Missouri, 897 F.3d 916, 920 (8th Cir. 2018). The Supreme Court explained:

> Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. While th[e Supreme] Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.

White v. Pauly, —— U.S. ——, 137 S.Ct. 548, 551 (2017) (per curiam). "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." Michael v. Trevena, 899 F.3d 528, 531 (8th Cir. 2018) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)).

The Eighth Circuit has explained that in analyzing whether a plaintiff has a clearly-established right, the "dispositive question is whether there was a fair and clear warning of what the Constitution requires." Thompson v. City of Monticello, Ark., 894 F.3d 993, 999 (8th Cir. 2018) (quoting Dean v. Searcey, 893 F.3d 504, 518 (8th Cir. 2018)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Thompson, 894 F.3d at 999 (quoting Burnikel v. Fong, 886 F.3d 706, 711 (8th Cir. 2018)). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." Rokusek v. Jansen, 899 F.3d 544, 548 (8th Cir. 2018) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

In support of his argument that he had a clearly-established right to be free from detention, Plaintiff relies on[7] Walker v. City of Pine Bluff, 414 F.3d 989 (8th Cir. 2005); El-Ghazzawy v. Berthiaume, 636 F.3d 452 (8th Cir. 2011); and Duffie v. City of Lincoln, 834 F.3d 877 (8th Cir. 2016).[8] In Walker, the Eighth Circuit affirmed the district court's denial of qualified immunity where an officer stopped, cuffed, and arrested a man for watching officers conduct a traffic stop. 414 F.3d at 991. The Walker court held:

> [c]rediting Walker's testimony, as we must, we have a case of a citizen who was arrested when he stood at a considerable distance from police officers engaged in a conversation with young men, who spoke only when spoken to, and who complied with [the officer]'s request for identification after pointing out that he had done nothing wrong. No reasonable police officer could believe that he had arguable probable cause to arrest such an on-looker in this situation, for obstruction of governmental operations or for any other purported crime.

Id. at 993.

In El-Ghazzawy, the Eighth Circuit affirmed the denial of an officer's summary judgment motion based on qualified immunity for a situation in which the officer, responding to a call, handcuffed and frisked a suspect whom a store employee thought may have sold counterfeit watches. 636 F.3d at 454-60. The El-Ghazzawy court held, "it is well established that if suspects are cooperative and officers have no objective concerns for safety, the officers may not use intrusive tactics such as handcuffing absent any extraordinary circumstances." Id. at 460. The Eighth Circuit explained that the "Fourth Amendment does not tolerate, nor has the Supreme Court or this Court ever condoned, pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous."

---

[7] Plaintiff also contends that Chief of Police Special Order 8-02 put Officer Wallace on notice as to Plaintiff's clearly-established rights.

[8] Because the Eighth Circuit issued the Duffie decision in 2016, which is after the February 6, 2015 incident at issue in this case, the Court does not address that decision as support for Plaintiff's position that the case clearly established his rights at the time of the 2015 incident.

Id.  (quoting Bennett v. City of Eastpointe, 410 F.3d 810, 841 (6th Cir. 2005)) (marks omitted).

The Eighth Court stated, "we conclude that a reasonable officer could not have believed it was lawful to handcuff and frisk a suspect absent any concern for safety."  Id.

Officer Wallace counters that these cases do not involve the particular circumstances at issue in the incident here.  See Defs' reply supp. mot. sum. j. at 7.  Specifically, Officer Wallace argues that Walker is factually distinct from this case because Plaintiff was not: (1) placed in a squad car; (2) taken to the police station; (3) observing the traffic stop during the day with children present; or (4) watching a male police officer.

In support of his argument, Officer Wallace relies on the Supreme Court's decision in White. [9]  In White, the Supreme Court held that "clearly established law" should not be defined "at a high level of generality. . . .  [T]he clearly established law must be 'particularized' to the facts of the case."  137 S. Ct. at 552.  The Court reasoned, "Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  Id. (marks and citation omitted)

White does not assist Officer Wallace.  The White Court did not establish a rule prohibiting reliance on general statements of law.  137 S. Ct. at 552.  The Court explained that "general statements of the law are not inherently incapable of giving fair and clear warning" to officers, but "in the light of pre-existing law the unlawfulness must be apparent[.]"  Id.  (marks and citations omitted).  Likewise, in Rokusek, the Eighth Circuit rejected the requirement of a

---

[9]  Officer Wallace also relies on the Fifth Circuit's decision in Turner v. Lieutenant Driver, 848 F.3d 678 (5th Cir. 2017).  In that case, the Fifth Circuit concluded police officers were entitled to qualified immunity for their initial detention (before handcuffing and placement in a patrol car) of an unarmed individual who was videotaping a police station from a sidewalk across the street and did not provide his identification when questioned by three police officers.  Id.  The Court finds the Turner case does not assist Defendant because it was issued after the February 2015 incident and the Fifth Circuit concluded qualified immunity was inapplicable to the officers' handcuffing and subsequent detention of the individual.  The incident at issue here focuses on both Plaintiff's initial questioning and detention by Officer Wallace, as well as Officer Wallace's searching and handcuffing of Plaintiff.

fact pattern identical to the circumstances before a court.  899 F.3d at 547-48.  The <u>Rokusek</u> court held:

> While none of these cases involve a fact pattern precisely like the one at issue here, there is no requirement that Rokusek must find a case where the very action in question has previously been held unlawful, so long as existing precedent has placed the statutory or constitutional question beyond debate.  [The defendant state trooper] had fair warning that he should not have thrown a nonviolent, nonthreatening suspect who was not actively resisting face-first to the ground.

<u>Id</u>. at 548 (marks and citations omitted).

Officer Wallace fails to meaningfully distinguish between this case and <u>Walker</u> and <u>El-Ghazzaway</u>.  In light of the Eighth Circuit's opinion in <u>Rokusek</u>, the Court finds that <u>Walker</u> and <u>El-Ghazzaway</u> provided sufficiently particularized notice applicable to the facts of this case.  Because Plaintiff's rights were clearly established at the time of his detention, Officer Wallace is not entitled to qualified immunity. Accordingly, Defendants' motion for summary judgment is denied insofar as it seeks summary judgment in favor of Officer Wallace.

### 2.   Officers Porter and Ludwig

Officers Porter and Ludwig also move for summary judgment as to qualified immunity.  The Court notes that Plaintiff's Amended Complaint does not allege any specific conduct by Officers Ludwig and Porter.  [ECF No. 14.]  Although Plaintiff alleges that Officer Wallace ordered Officers Porter and Ludwig to handcuff Plaintiff and "Defendant Police Officers handcuffed" Plaintiff [ECF No. 14 ¶¶ 40, 42], the undisputed record establishes that solely Officer Wallace questioned, searched, and cuffed Plaintiff during the February 2015 incident.  <u>See</u>, <u>e.g.</u>, Pl.'s Statem. Mat. Facts ¶¶16, 18, 19 [ECF No. 69], and Defs.' Response to Pl.'s Statem. Mat. Facts ¶¶ 16, 18, 19 [ECF No. 79].

Section 1983 imposes liability only on a person who "subjects, or causes to be subjected," any individual to a deprivation of constitutional rights.  <u>Pembaur v. City of</u>

Cincinnati, 475 U.S. 469, 478 (1986). Section 1983 does not permit liability based exclusively on the conduct of a fellow employee, supervisor, or individual other than the defendant. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-92 (1978). To survive summary judgment, Plaintiff must identify facts showing that Officer Porter and Officer Ludwig violated Plaintiff's rights. See Mendoza v. United States Immigration & Customs Enf't, 849 F.3d 408, 418 (8th Cir. 2017) ("Government officials are personally liable only for their own misconduct" (marks and citation omitted)). The Court finds that Plaintiff does not identify any facts showing that Officers Porter and Ludwig violated Plaintiff's constitutional rights. Due to the absence of any evidence that either Officer Porter or Officer Ludwig directly participated in the alleged violations, the Court grants summary judgment in their favor with respect to the only Count against them, Count I, on the grounds of qualified immunity. See id. (a defendant was entitled to qualified immunity "[b]ecause he had no 'direct participation' in the alleged violations").

### C. City of St. Louis/Municipal Liability

The City asserts it is entitled to summary judgment because Plaintiff failed to identify a policy, practice, or custom that violates the Constitution. Plaintiff responds that the testimony of Lieutenant Lauer, the Commander of the SLMPD Traffic Safety Division, establishes an unwritten policy that allows "police officers to seize and search a person in a public place without reason to believe that the person is engaging in criminal activity or that the person is armed and dangerous" in violation of the Constitution. [ECF No. 80 at 13.]

Under 42 U.S.C. § 1983, a municipality cannot be held liable for the tortious conduct of an employee, unless the employee acts pursuant to a municipality's "official policy." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually

responsible[.]" Thompson v. Shock, 852 F.3d 786, 793 (8th Cir. 2017) (emphasis in the original) (marks omitted) (quoting Pembaur, 475 U.S. at 479-80).

A municipality may be liable if one of its customs or policies causes a violation of a plaintiff's rights. Crawford v. Van Buren Cty., Ark., 678 F.3d 666, 669 (8th Cir. 2012). "When a plaintiff can point to a municipal policy that either violates federal law, or directs an employee to do so, no evidence is needed other than a statement of the municipal policy and its exercise to establish a constitutional violation." Brewington v. Keener, 902 F.3d 796, 801 (8th Cir. 2018) (marks and citation omitted). "But when a plaintiff alleges an unwritten or unofficial policy, there must be evidence of a practice, so permanent and well-settled so as to constitute a custom that existed." Id. (marks omitted) (quoting Davison v. City of Minneapolis, 490 F.3d 648, 659 (8th Cir. 2007), which cited City of St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988)). "Liability for an unconstitutional custom or usage . . . cannot arise from a single act," but "can be shown only by adducing evidence of a continuing, widespread, persistent pattern of unconstitutional conduct." Crawford, 678 F.3d at 669 (marks and citations omitted).

The City asserts that Plaintiff failed to identify an official policy of the City authorizing officers to detain citizens without articulable suspicion. The City further contends that Lieutenant Lauer's testimony does not describe an "official policy," because an unwritten policy is insufficient to establish municipal liability.[10]

In support of its argument, the City relies on Jane Doe "A" v. Special Sch. Dist., 901 F.2d 642, 645-46 (8th Cir. 1990). In Special Sch. Dist., the court held that, for a defendant to be liable "on the basis of custom, there must have been a pattern of 'persistent and widespread'

---

[10]  The City argues that Lieutenant Lauer is not a final policymaker for SLMPD, lacks the authority to make final policies for the SLMPD, and was not designated to testify about policies. However, the City states that, even if Lieutenant Lauer described an unwritten custom, it is not so widespread and well-settled as to give rise to an "official policy" under Monell. See Davison, 490 F.3d at 659.

unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." Id. at 645-46 (citing Monell, 436 U.S. at 691).

Plaintiff contends that the City has an unconstitutional unwritten policy based on the testimony of Lieutenant Lauer [ECF No. 80 at 12]. Plaintiff argues that Lieutenant Lauer's deposition testimony confirms that City's unwritten policy contradicts well-established constitutional law that a police officer must have a reasonable suspicion of criminal activity prior to detaining a citizen:

> Q. Is it a policy of the City of St. Louis Police Department that you can be – that a citizen in a public place can be detained without believing that that citizen was engaged in any crime?
>
> . . . .
>
> A. I don't know that this occurred in this case, but yes, they – I mean, they – they can be detained for an investigation.
>
> Q. So –
>
> A. The officer followed his training.
>
> Q. And – All right, so, let's talk about it's the training of the police officers of the City of St. Louis or training that you expect them to have that if they encounter a citizen in public, they can detain them without consent, right, they can detain them without having prior reason to believe that that citizen is engaged in any criminal activity.
>
> . . . .
>
> A. They had information that he may have been a suspicious person, they didn't know exactly what he did yet; that's what they're investigating.
>
> . . . .
>
> A. In this – I mean, yes, in some cases.
>
> Q. In some cases, including this one?
>
> A. Yes.

Q.      And this one with Mr. Chestnut?

A.      Yes.

[ECF No. 81-4 at 67-69].

Lieutenant Lauer's testimony does not help Plaintiff, because it does not describe an unwritten policy authorizing SLMPD officers to detain a citizen without reasonable suspicion. Even if such a practice existed, Lieutenant Lauer's testimony does not establish "evidence of a practice, so permanent and well-settled so as to constitute a custom that existed." Brewington, 902 F.3d at 801.  Nor does Lieutenant Lauer's testimony show that such a practice was the basis for Plaintiff's detention.  See Special Sch. Dist., 901 F.2d at 645-46.  At most, Plaintiff points to "some cases" in which a SLMPD officer stops a person without having prior reason to believe the person is engaged in criminal activity.  Moreover, Plaintiff ignores Special Order 8-02, the City's official policy regarding investigatory stops.  Special Order 8-02 directly contradicts the purported unwritten policy relied on by Plaintiff, and therefore, establishes that any unwritten policy cannot be so well-established as to "have the effect and force of law."  See Special Sch. Dist., 901 F.2d at 645-46.

Plaintiff fails to show, with respect to detentions of individuals, that City has a "pattern of 'persistent and widespread' unconstitutional practices which [is] so 'permanent and well settled' as to have the effect and force of law."  See Special Sch. Dist., 901 F.2d at 646.  Therefore, the City is entitled to entry of summary judgment in its favor with respect to the only count against it, Count II of the first amended complaint.

Accordingly, after careful consideration,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment [ECF No. 67] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [ECF No. 70] is **GRANTED in part** so that summary judgment shall be entered in favor of Defendant Porter, Defendant Ludwig, and Defendant City, and **DENIED in part** so that summary judgment is not entered in favor of Defendant Wallace.  The case remains pending only with respect to Plaintiff's Section 1983 claim in Count I of the first amended complaint against Defendant Wallace in his individual capacity.  Therefore,

**IT IS FINALLY ORDERED** that the jury trial before the undersigned of the remaining claim is scheduled for Tuesday, January 22, 2019, at 9:00 a.m. in Courtroom No. 9.  The provisions of the Order Relating to Trial [see ECF No. 23] remain in full force and effect with respect to this trial date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of November, 2018